Good morning, Your Honors. Solomon Serra, appearing for the appellant John Sender, the plaintiff below. I'm going to reserve four minutes of my time, and I want to address three issues that this Court will conduct a de novo review of. Jurisdiction, proper defendant, and summary judgment on statute of limitations. There are certain critical facts here that I think are germane and inform the analysis of all those issues, and I'd like to briefly go over them. Mr. Sender was present at the creation of Franklin in the 1970s. While he was there, they put a retirement plan in place, and he was a beneficiary of that plan, but he was not given the plan.  He was told in a 30-second conversation recited in his affidavit that he was going to be a beneficiary, and upon retirement, decades in the future, when he reached age 65, he'd get a benefit. He leaves Franklin. They changed the plan after he departed to give him an immediate entitlement to the benefit. Again, no notice, no information whatsoever provided to him at that point in time. Unbeknownst to Mr. Sender, they distribute benefits to the plan that he was a beneficiary of in August of 1982. He's not at Franklin at that time. He's not contacted at that time. No efforts are made to locate him, and they distribute, they say, the shares to Mr. Sender at an address. It turns out it was an address that he had left long before that time. Now, in the period of time when Mr. Sender was between his sessions at Franklin when they distributed the stock, he was actually working with personnel from Franklin. They were working in the same conference room, sitting around talking about Franklin's business, and at no point in time during those conversations when the original employee stock ownership plan was being distributed, was he told anything by Mr. Charles Johnson, the chairman and chief executive officer of Franklin, who he worked with? He was not asked, did you get the shares? He was not asked, what's your address? Our secretary would like to know. We've got the shares. Nothing. No communication whatsoever. Was Mr. Johnson a member of the ESOP committee? Yes. He was the third member? Yes. One of the three? And he was not only that. He was the agent for service of process for the committee, and he was also a member of the trust committee, the trust that oversaw the activities of the committee. So the record shows, Your Honor, I think frankly, indisputably, that Franklin had a stale, incorrect and garbled address for Mr. Sender on its records at the time it distributed the stock, and that's why he's never received it, and of course he's attested under penalty of perjury over and over again. Let me ask you, what do you make of this, I don't know what it is, it's an IRS, it's a statement, this 1984, from Franklin Resources, it's a distribution of, showing a... Yes. $44. No, it's the one that says it's got $67,515. Your Honor, I think Franklin submitted the document like that, the top half of the document has nothing to do with Mr. Sender. It's completely irrelevant to him. The only argument that was made from that document was the bottom part. But both of these two documents note the employee stock ownership plan and trust. They do. They do say that on the face of it. But you just said that he didn't know anything about it. No, he didn't. He didn't know that... You said he didn't know that he was a member of the plan. No, he knew. He was told by Mr. Scatina when he first left his employment that he was a member of a plan. He did know that. We don't deny that. He was never given any documents about it, however, and the issue with regard to the by the court to conclude that he was on notice of an entitlement to a claim under the plan. And therefore, his claim was barred by the statute of limitations. That is how that document was used by the district court. It does refer to the plan at the top, but it's a de minimis amount of money, and it was sent to Mr. Sender at a time when he was receiving other amounts of money from Franklin that also represented differences. So in 1984, about the time this was mailed to him, what was this stock trading at? I don't know the answer to that, Your Honor. That's a cash distribution out of the trust. I don't know what the stock was trading at. It was trading at something probably above what he initially was entitled to receive it at. I don't know the stock price at that point in time, but I don't think that's relevant, Your Honor, because the only purpose that this document was used by the district court was to throw Mr. Sender out on summary judgment, claiming that put him on notice that he had a claim. But it didn't. It didn't put him on notice that he had a claim. It's a de minimis amount. It came at the same time that he received numerous other dividends on money market funds, on other ESOP shares that he had, on shares that he individually owned, Your Honor. Was he a member of any other ESOP committees? No. Plans? This was the only ESOP? Yes. Was there any other stock in the ESOP other than the Franklin stock? No. This was a single employer plan. Single, right. Yes, it was. But he had no information about that plan, Your Honor. No, he was never provided any documents. All he got, Your Honor, were items such as that. That's probably the only single item in the record that he received that made reference to the existence of a plan. It's a $44 cash distribution. And the court, district court, found that was enough to put him on notice under the that he had a claim that had been denied. But he didn't know he had a claim. All that suggested was that there was still stock and or cash sitting in a trust account that he had been told he would be entitled to on. The district court also relied on these proxy statements. Yes. Yes. Proxy, proxy cards for 83. Yes, it did, 84, 83 and 84. And Your Honor, if I may address that. Adam, they, well, you can't tell the exact, somebody penciled in some numbers, but. He didn't. Mr. Sender did not. His affidavit makes clear that that was done during the administrative review by Franklin for their own internal purposes. Does he claim that he owned, his own shares of Franklin outside of the ESOP at this time? Yes, absolutely. He did. He had the Jameson shares, which he purchased from the chairman of the company in this period when he was first employed by Franklin. So he did have other shares. Let's talk about those proxies for a minute because, again, you've hit on the documents that the district court, those two documents the district court used to knock this case out on summary judgment on statute of limitations. Those proxies reflect no information about number of shares. They show that he jointly owned the Jameson shares with his wife and signed a proxy for that. And he signed a proxy for other shares, which he individually owned. And he individually owned not only the ESOP shares, but he had 20 other shares of Franklin that he had earned during his first period of employment. He also owned those. There is nothing on that proxy that distinguishes between the ESOP shares and the personally owned shares that would put Mr. Sender on notice, again, under the Withrow standard, that he had a claim that had been denied, let alone notice that he was entitled to these shares immediately. For all he knew, they were still in the trust. And he was told, when you turn 65, you're going to be entitled to them. Well, guess what? That's what happened. When he turned 65, the federal government sometimes works and does things right. And it gave him a notice and said, you're entitled to these shares. And when it did that, he immediately acted on that. So those documents are clearly insufficient. I didn't realize the Social Security was so, you know. It worked. It worked, Your Honor. All seen. It's not all seen, but it worked to put him on notice that he had an entitlement. And he acted on that immediately. Immediately, he took action. And that suggests that that was news to him. And certainly under the Withrow standard, he had never had any notice that there was a claim that had been denied. Your Honor, what happened to the shares? I mean, go ahead. He's receiving the proxy card. He may not know how many shares it refers to. He's receiving money. They have his address right at that point. Somehow they've got the same address that's being used, and he returns the proxy card. I know how these things work. I had to buy a share of stock when I was in law school, and I keep still getting paper from them every single year. It cost him a fortune for that share of stock. So what happened to the shares? It's a mystery. No one knows, Your Honor. But they're lost. And that's why under Corporations Code Section 419, the court should not have preempted that claim. Well, what happened to that claim? It's not in the Second Amended Complaint. How is it that it seems to have disappeared from the lawsuit? It was disappeared, Your Honor, because the district court ordered it was wholly and fully preempted by ERISA, and we couldn't bring the claim. If you examine the Second Amended Complaint, there are two or three paragraphs in that complaint that say, we're preserving our right to appeal the dismissal of this claim. But the court said, you cannot proceed except exclusively under ERISA. Now, if Mr. Sender's 5-year-old son decided to make a paper airplane out of this share certificate when it was delivered to his house, or if his dog chewed it up, he would be able to bring a claim under this Corporations Code statute to have a replacement of a lost, stolen, or destroyed stock certificate. That's the first cause of action that was ever pled in this lawsuit when it was first filed in 2011. And that's – You had two other causes of action in Superior Court. We did. We had a negligence and fiduciary duty breach. Those two are likely preempted. Yes, and we're not disputing that, but we're saying we should have been permitted to proceed with the lost or stolen stock certificate because that's an independent legal duty under the Marin General case, whereby the company is required to replace something that's lost. It's not about delivery, and it's outside the purview of ERISA. It's replacement, Your Honor. Now, I'd like to turn to the next issue, which is the proper defendant. And, Judge Clifton, your opinion in Sear is obviously clearly relevant to this and the Ninth Circuit's recent opinion in Spindex. I've got to tell you, a couple of days ago, somebody cited an opinion of mine that was just from two years ago. I was completely clueless. That name didn't mean anything to me. Well, Your Honor, it was an on-bank decision and a very important one in the world of ERISA, and it had significant implications throughout the country. So we are relying on Sear and the progeny of Sear, the Spindex case. The idea that there's no claim against the issuer here, Franklin Resources, because it used a planned committee to effectuate decisions about the administrative claim, clearly has no basis in the law. Obviously, internal corporate committees are the same as the corporation. I mean, I practice a lot in the securities law area. If an audit committee screws up and allows a bogus financial statement to be issued, you don't go out and sue the audit committee. You sue the company, because the audit committee is acting by and for the company. And every indicia of fact that was before the court here suggests that this was Franklin all along. There was no difference. We've cited the Goody's case. We've cited Spindex, the recent Ninth Circuit case. And these all stand for the proposition that when there's this kind of intertwined relationship, the committee is appointed by Franklin. It consists of Franklin officers. It had the exclusive power to appoint and remove members of the committee. It indemnified the committee. It paid their lawyers and accountants. It used the chairman of the company to be its agent for service of process. I mean, obviously, this is Franklin. Right. Okay. I'm going to reserve the remainder of my time. I'll give you some extra time, but I have a question for you. So, you know, there's another doctrine in play here that the district court invoked, latches. Yes. Latches. We have the benefit of a very recent United States Supreme Court opinion on latches under Petrella, which is unusual. There's not a lot of Supreme Court decisions under Petrella. If you apply Petrella to this case, it's clear that latches cannot be applied. Why not? It's because there's a cause of action that has a specific statute of limitations in it, and we filed the case within that statute of limitations under Withrow and the federal common law of four years from the date the accrual of the claim arose. So we have met Petrella, and furthermore, Justice Ginsburg in Petrella said, latches is not appropriately invoked, not appropriately invoked at all, where, quote, any hindrance caused by the unavailability of evidence is at least as likely to affect plaintiffs as it is to disadvantage defendants. So on two scores under the recent Supreme Court authority, latches cannot properly be applied in this case. We filed the case consistent with the statute of limitations, and the prejudice, if anything, is as great to the plaintiff here as it is to defendant. So latches should not be applied. Thank you. I'm going to reserve my time. Good morning, Your Honor. May it please the Court. Brad Huss for Franklin Resources. I'd like to start by correcting a couple of misstatements by counsel. He claimed, as I understood it, that Mr. Sender turned age 55 and was eligible for a distribution of the plan when he received a notice from the Social Security in 2007. That's not correct. Mr. Sender turned 55 in 1997, long before he made any claim, and he should have known at that time, even under the terms of the plan before they were changed, that he was eligible for a distribution. When was the notice from Social Security? In 2007, Your Honor, when he turned 65. So he would have known in 1997, if he had been aware of the terms of the plan, called for a distribution at age 55. Correct. What's the chance he knows that? Or is it compelling that he knew? He claims he didn't know anything about the plan. I mean, there are a lot of plans I don't know a whole lot about. Correct, Your Honor. When you need them, you go look them up. I'm not sure that the fact that under the original plan, he would have been eligible for a distribution at age 55 is something that he's likely to have stored away come 1997. Right. I just wanted to correct the factual aspect of this statement. Also on the Petrella case, counsel stated that Petrella applies to this situation because there is a statutory statute of limitations on his benefit claim. That is not correct. There is no ERISA statute of limitations on a claim for benefits. It's a legislative whole, as the court discusses in Petrella. What the courts, including many cases in the Ninth Circuit, including the Withrow case cited by counsel, there's no statute of limitations of the statute, so they apply the most closely analogous state law statute, which here in California is a four-year statute for claims on written contracts. So Petrella actually helps us. Petrella says, when Congress fails to enact the statute of limitations, a federal court that borrows a state statute of limitations but permits it to be abridged by the doctrine of latches is not invading congressional prerogatives. It is merely filling a legislative hole. That's the situation we have here. No ERISA statute of limitations adopted the state statute, latches applies here under Petrella. So, you know, when I think about ERISA in claims, denial of a claim or whatever, you think of a claimant, a beneficiary of a plan or a participant in a plan files a claim or whoever, plan administrator, and says, I didn't get benefits or I'm applying for benefits or whatever that might be. And the plan takes some action. Here the plan said, well, you know, it's too, you're too late. They didn't say you're too late when he made his claim. They didn't say you're too late. Instead, they went ahead and they, they investigated the whole thing. Correct. Right? They investigated. They have a fiduciary duty to do that. They investigated it. Yes. Right. But, you know, it's presumably these, the plan could have, I guess the plan could have said, you know, you're just too late. Well, I don't think. They didn't do that. They investigated. Right. They looked for things and then they, then they denied, they said, well, we sent you, we sent you these, these, these documents, the certificate. Yeah. We sent you the certificate and, you know, too bad. It was not just a certificate. There's a plethora of evidence, evidence that was found. So then, so then he then files a lawsuit. Yes. Right? So your claim is that, well, he should have known back in 1983, three, that he had a claim. Correct. And why should he have known that? As we've pointed out, he started, we're talking about stock here, a specific asset, not cash. He exercised incidents of ownership over that stock in 1983 and 1984. He received dividends from the stock. He cashed them. He reported them on his income tax return, specifically identifying those dividends. He voted the proxy cards. And then in 1984. I'm going to show some of, some of my ignorance here, but, so he got a stock certificate showing that he had a certain number of shares, correct? Correct. There was a stock certificate issued. Yes. Okay. Now, if he wants to sell, let's say he only wanted to sell 10 of those shares. Right. Does he get, have to apply to the company to get this? No. He would sell it. And this is a key point, going to the latches, Your Honor. He would sell the shares, and we believe he did sell the shares, through the stock transfer agent. Not Franklin. And that stock transfer agent was Bank of New York. Bank of New York destroys these records after seven years. So in 1984, he stopped receiving dividends. He stopped receiving proxies. That would only happen if he sold the stock or transferred it. Those records were not in custody of Franklin. They were in the custody of the stock transfer agent, Bank of New York. Bank of New York destroys those records after seven years. So when someone shows up 23 years later, they're gone. So let's say he said, sell 50 shares. Pardon? Let's say back in 1984 or whatever, way back, he wants to sell 50 shares. Right. Okay. What documentation does he get from the Bank of New York? Well, if he sold part of the shares, he would get a new certificate for the remaining shares. That would all be handled outside Franklin. We would not have records of him doing that. Was there any attempt to contact the Bank of New York or whoever, you know, the trading agent, and find out what records they had? Oh, yes. We contacted them. They're still—they were until they were sold to Computer Share, the, you know, stock transfer agent for Franklin for many years. We went to get the records. Seven years, they're gone. Long before the lawsuit came into existence, Your Honor. And on the dividends— How do we know that he sold the 140, whatever it is, the 1,400 shares? 1,450 shares. How do we know that he—how do we know that he sold them? Those are the key records missing because of his sitting on his rights for 23 years. Those records simply don't exist anymore. If they did, I think it would be case shut if Bank of New York could not destroy those records, and that's not our fault, Your Honor. The notion that he sold them is your inference from the fact that he has proxy cards from 83 and 84, and they show dividends being paid, but apparently by 85, they've stopped? Correct. Are there records that show they've stopped? He didn't receive any more, Your Honor. And he went off—we do have— What about the joint account, the shares he held with his wife? We didn't pursue what he did with those, Your Honor, because, I mean, they're not relevant to the— Is there any indication that he sold those— I believe those ended as well in 1984, Your Honor. But we do have records, the list of shareholders of record, and he's on the list of shareholders of record, 82 when we think the stock was distributed to him, 83 and 84, 85 and after, he's no longer on the list of stockholders of record. So that's further evidence that something happened with those shares in 1984. His lawsuit—his original lawsuit filed in the state court was basically a lost certificate lawsuit. Why isn't that still alive? To me, he could have replayed his Section 419 claim in the federal court. So if we decide looking at the papers— But the other two claims— Pardon? If we decide looking at the papers that that wasn't relinquished by him, that it was retained by whatever foot in the door he kept in the Second Amendment complaint, then it would be appropriate to recognize that it could still be remanded to state court. I don't think so. The court would have—federal court would have had supplemental jurisdiction over that claim. He waived it by not including it. Well, but how would that be extinguished? All the logic in the district court's order related to the ERISA claim. I didn't see anything that said that you couldn't claim for a lost certificate. Because in his claim, in his state court complaint under the state Section 419, he specifically asserted a claim for shares from an ESOP. He asserted a claim using the word benefits under that state law claim. That claim was totally and completely preempted. The ruling is it was preempted. It doesn't exist. See, the other state law claims I could understand. I'm not sure how the lost certificate claim would be preempted by ERISA. That's not a claim against a plan that owes me shares. It's a claim that says I got the shares, but the dog ate my homework. And so as a shareholder, I'm entitled to go get a replacement for a lost certificate. Well, it's simply, you know, an end run to try and get the benefits, Your Honor. That's the way— What? No, no, no. Suppose he, in effect, has to acknowledge, okay, I had a certificate, it's been lost, or they tell me I had a certificate, it's been lost. What is it that prevents him from filing a claim in state superior court saying I want to get the certificate replaced? That's the original claim he filed, I think. Along with two other claims, which are completely preempted. Right. And the other claims, let's accept for the moment that you win. We sustain—I don't understand why the lost certificate claim has been extinguished because he no longer has the ERISA type claim. We believe it's simply a substitute claim for benefits. We're not talking cash here. We're talking a very specific asset. Shares of stock. It's just another way for him to try and sue to get benefits in the form of stock. If I bring multiple causes of action, and I can, and people regularly do, and some of them are extinguished for some reason, say the statute of limitations, you don't throw everything else out just because some of the claims are properly extinguished. I haven't heard a reason that explains why the lost certificate claim is extinguished. Other than what you've told me now twice, we think it's an end around. I don't care that it's an end around. If he can bring a separate cause of action, then it should survive unless there's a reason to extinguish it. Well, again, it's simply a different way to try and get something that's preempted. What I understood the district court did, it said that the negligence claim and the other claims. Breach of fiduciary duty. Right. Those were clearly preempted. Clearly. And the stock replacement claim, the other state law claim, the corporations claim, was not totally preempted. And that the court would have supplemental jurisdiction over that claim. The court could have. And then the court said, file amended claim, basically to get rid of those preempted state law claims. File benefits claim. They did that. And when they did that, though, they removed the corporations claim. But they said, the counsel just said that they did that under compulsion of the district court. I don't think the court said, do not file the 419, the state law claim. They waived it. And keep in mind, the court also gave Mr. Sender another chance to file an amended complaint. And he declined to do it. He stood with a chance to amend his complaint. He deliberately stood on his singular risk of cause of action. I've got to say, it looks to me like paragraph four of the second amended complaint stakes out that state law claim, acknowledges that it doesn't pursue it at this time because of what it understands the court's order to be. So if, in fact, we conclude that he staked out the claim sufficiently, is there any reason for that claim to have been extinguished other than what you've told us so far? That, to my mind, Your Honor, is the reason. I would like to also just very briefly go to the motion for judgment on pleading. Is Franklin a proper defendant? And is Your Honor's decision in SIR the key one? And what SIR said is that a party who is responsible to pay benefits is a logical defendant in an ERISA case. But SIR is very different. I don't think SIR speaks very clearly of this case. But I'm not sure, and this isn't an ERISA case like I've ever seen before because this isn't a claim from somebody saying, I'm disabled, I'm entitled to benefits. There's really no dispute about plaintiff's entitlement here. The company doesn't say you're not entitled to benefits. The company says, and the plan says, we sent that certificate and you knew about it and so forth. And so if it was the plan administrator that sent out certificates and the plan administrator sent it to the wrong address, it's not illogical to say the plan administrator is the proper defendant. If here it's this Franklin committee that's doing it, I'm not sure it's illogical that the Franklin committee, which has no separate legal existence from the company, is the proper defendant. But he didn't sue the committee. He could have sued the committee. Well, but— The district court gave him a specific leave to amend his complaint to add causes of action to add defendants. He chose not to. I'm not sure that that's meaningful. The committee has no separate legal existence, does it? Yes, it does. Can I address that? If there's a fund, it does. No, if there's a fund, it does. But there's no fund here because those shares were distributed 30 years ago. No, this was a plan that had a trust, separately funded, fully funded trust. Franklin, counsel has conceded, Franklin put the shares into this trust, which is a separate trust. What's in the trust today? The trust said it would, you know, pay benefits. What's in the trust today? Nothing. It was the trust— That's the problem. The trust was completely depleted— Isn't that the problem? —by issuing the shares. Okay. Well, he should have sued the committee, and he didn't. You know, the committee is the plan administrator. He chose his cause of action, and the court ruled against him. And we request that it be upheld, Your Honor. Okay. Thank you very much, counsel. Thank you. We had a minute—you had almost two minutes for everybody. Thank you, Your Honor. This committee, of course, no longer exists. And because the trust has been dissolved, the committee no longer exists. These events happened a long time ago. There's no committee to sue here, but they were always acting for and on behalf of and for the purposes of Franklin, so it's proper to sue Franklin. Now, I think something's gotten lost here because this is a Rule 56 issue on the statute of limitations, where the plaintiff's evidence is to be taken as true. All inferences are to be drawn in his favor. And there's two issues—delivery and timeliness of the claim. Delivery, Mr. Sender, is unequivocal. He did not receive the shares. Timeliness, all they've got to rely on are these evidences of incidents of ownership. But they mean nothing insofar as the withdrawal standard, because we're talking about two is a proxy which doesn't distinguish among the shares and doesn't put him on notice of an entitlement to a claim under a plan he didn't know anything about. And the other one are de minimis minor dividend payments that are reflected accurately on a federal income tax return on one sheet of paper, again, not distinguishing between where they came from. They're minor. No reasonable person would conceive that these $200, $300, $44 payments would give him notice of an entitlement to a claim under the withdrawal standard. So that argument loses. The fact is that we have a full record, actually, with regard to his tax returns. They were all produced, incredibly, 1982 through the early 1990s. They were all produced by Mr. Sender to Franklin. And they've had a chance to examine those. They've come up with this one sheet of paper that clearly is not sufficient to entitle them to summary judgment. The policy of this statute and the expressed terms of the plan document itself says that the purpose is to allow beneficiaries to retain and receive their retirement benefits. Mr. Sender declares under penalty of perjury he never received it. These were honest services. He's earned a right to try and pursue this benefit. Thank you. Okay. Thank you very much, counsel. We appreciate your arguments in this matter. Very interesting. That ends our session for today, for the week, and so we're in adjournment.
judges: Paez, Clifton, Duffy